IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   12-cv-00413-WYD-MEH

LIDIA BARRERA and
TELESFORO BARRERA, SR.,

      Plaintiffs,

v.

AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY,

      Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

     THIS MATTER is before the Court on Defendant American National Property and Casualty Company's ["ANPAC"] Motion for Summary Judgment.  ANPAC seeks judgment on Plaintiffs' claims of breach of contract, bad faith, and violation of Colo. Rev. Stat. §§10-3-1115 and 1116 on the basis that its rescission of fourteen insurance policies issued by ANPAC to Plaintiffs was valid and other arguments.

     A response in opposition to the summary judgment motion was filed on February 8, 2013, a reply was filed on February 21, an errata to the reply was filed on March 19, and a surreply was filed on April 12, 2013.  Thus, the motion is fully briefed.  For the reasons discussed below, ANPAC's Motion for Summary Judgment is denied.

II.   <u>FACTS</u>

     This case relates to the issuance to Plaintiffs and subsequent rescission by ANPAC of fourteen insurance policies.  At the time of the issuance of the insurance

policies, Plaintiffs were husband and wife and resided at 4345 Marlow Court, Colorado Springs, Colorado 80916.  Lidia Barrera participated in the application process on behalf of the Plaintiffs as it was the couples' custom and practice to allow her to handle these types of business issues, including managing the affairs of their business, a local bar.[1]

Thus, on or about April 26, 2010, Plaintiffs obtained an automobile insurance policy for their 1983 Dodge B250 4x2 Van.  On or about October 1, 2009, Plaintiffs obtained an automobile insurance policy for their 1976 Chevrolet Monte Carlo S8.  On or about August 2, 2006, Plaintiffs obtained a rental owners policy for property they owned at 4268 Marlow Court, Colorado Springs, Colorado.  Over the course of time the Plaintiffs obtained fourteen different insurance policies from ANPAC which are listed in chronological order below:

| Policy Number | Effective Date | Exhibit |
|---|---|---|
| 1. Policy #05-H-198-84C-1 | 8/2/06 | C |
| 2. Policy #05-D-198-62C-7 | 8/2/06 | D |
| 3. Policy #05-D-199-53C-7 | 8/2/06 | E |
| 4. Policy #05-D-199-31C-3 | 8/2/06 | F |
| 5. Policy #05-D-041-17K-0 | 7/27/09 | G |
| 6. Policy #05-A-249-79K-6 | 10/1/09 | H |
| 7. Policy #05-A-249-67K-0 | 10/1/09 | I |
| 8. Policy #05-A-249-66K-1 | 10/1/09 | J |
| 9. Policy #05-H-223-88K-5 | 10/1/09 | K |
| 10. Policy #05-A-249-77K-8 | 10/1/09 | L |
| 11. Policy #05-A-988-23K-8 | 4/26/09 | M |
| 12. Policy #05-H-493-36L-9 | 10/1/10 | N |

---

[1] I have not cited to the record as to the facts in this paragraph as they are not disputed. Henceforth, I will cite to the record only where the facts are truly disputed or I deem it necessary.  On that issue, I note that Plaintiffs' Response to the Movant's Statement of Material Facts sometimes did not actually address whether they admitted or denied the fact at issue, instead conditionally admitting the fact or adding editorial comments.  To the extent Plaintiffs did not deny the fact at issue or provide evidence to support that denial, I have deemed that fact admitted.  Finally, I have cited only to those facts I deem most relevant to resolution of the motions.  I have, however, considered all of the facts cited by the parties.

| | | |
|---|---|---|
| 13. Policy #05-H-493-48L-5 | 10/1/10 | 0 |
| 14. Policy #05-H-493-41L-2 | 10/1/10 | P |

After issuance of the policies, a fire occurred at the rental home owned by Plaintiffs at 4268 Marlow Court.  The first fire occurred on March 14, 2011, and was accidentally caused by a young child living in the home.  According to the Complaint, the fire damaged portions of the home's content and upper level before it could be extinguished.  (Compl. and Jury Demand ["Compl."] ¶ 6.)  The second fire broke out in the early morning hours of March 15, 2011 (*id.* ¶ 7), and was determined to be incendiary in nature.  As a result of these two fires, Plaintiffs claimed damages to their Van and Monte Carlo.  Plaintiffs also made claims for loss of contents, loss of rental value and loss to the structure of the home itself.

According to the Complaint, Plaintiffs submitted timely notice of their claim to ANPAC.  (Compl. ¶ 10.)  As ANPAC's investigation indicated that the subject fires were suspicious in nature, pursuant to their protocol with regard to any suspicious claims, ANPAC then conducted a criminal background search concerning the Barreras.  This search revealed that Mr. Barrera had been convicted of a felony in the past, before the Barreras applied for insurance.  The felony related to Mr. Barrera claiming he had completed all of his community service after being convicted of a misdemeanor for driving under the influence.

ANPAC's coverage attorney took the examination under oath of Lidia Barrera.  She testified as to the rental owners' application that while she thought that ANPAC filled out the application, she signed it, and admitted that she knew the insurance

company would be relying on the information she gave in the application in order to decide whether or not to issue her insurance.  (Def.'s Mot. Summ. J. ["Mot."], Decl. of Bruce William Kelley ["Kelley Decl."], Ex. A, Barrera Depo. 84:1-10, 85:1-5.) Mrs. Barrera also testified that the "no"  answer to the question, "Have you or any member of your household been convicted of a felony or drug possession" was not truthful, as two members of the household—Telesforo Barrera, Sr. and Telesforo Barrera, Jr.—had been convicted of a felony.  (*Id.* 85:6-21.)  She knows now that she should have checked the box "yes" in answer to this question.  (*Id.* 86:21-23.)  Finally, Mrs. Barrera testified that when she signed her name on the application she was confirming that the information was true and correct but said, "I probably didn't even read it, I just signed it."  (*Id.* 86:13-21.)

Upon the completion of its investigation, and based upon the recommendation of its coverage counsel, ANPAC rescinded all of the policies, returned the policy premiums and considered the policies void *ab initio*.  The purported rescission was based on the ground that Mrs. Barrera had knowingly misrepresented in the applications that no member of her household had been convicted of a felony or drug possession.

With the letter denying Plaintiffs' claim, ANPAC included approximately $20,000 in checks refunding the premiums for twelve of the fourteen insurance policies.  ANPAC also advised that it would be paying and assuming the Barreras' mortgage pursuant to the loss-payee clause in the policy covering the burned residence.

ANPAC states as to its rescission actions that it initially only discovered twelve of the fourteen policies which had been issued.  When it later discovered the two

additional policies, these were also rescinded and the premiums in the amount of approximately $5,000 were refunded.  (Mot., Decl. of Kelli Anderson ["Anderson Decl."], ¶ 4.)  The rescission of the last two policies was done in October 2012, more than a year after the purported rescission all of the Barreras' insurance policies.

Plaintiffs admit that ANPAC purported to rescind all of the Barreras' insurance policies and that ANPAC tendered checks reflecting the premiums for twelve of the policies.  Plaintiffs assert, however, that ANPAC issued the refund checks to them without explaining that cashing the checks would result in a mutual rescission under Colorado law.  (Pls.'s Resp to Def.'s Am. Mot. Summ. J. ["Resp."], Ex. 8.)  ANPAC then sent additional letters urging the Barreras to cash the checks, again failing to explain that doing so would result in a mutual rescission.  (*Id.*, Ex. 9.)[2]  Ms. Anderson, the claims professional handling the Barreras' claims, testified that if the refund checks had been cashed, ANPAC "would have gone after the Barreras for the repayment of whatever payment we made to Bank of America."  (*Id.*, Ex. 11, Anderson Depo. 122:6-21; *see also* Anderson Decl. ¶ 1.)  Further, Plaintiffs assert that ANPAC wrongfully withheld the premiums for two of the policies for well over a year.

Upon ANPAC's denial of the Barreras' claims, the Barreras retained counsel and filed this lawsuit.

ANPAC maintains that ten of the fourteen insurance applications have the question "Have you or anyone of your household ever been convicted of a felony or

---

[2]  ANPAC asserts that Plaintiffs provided no factual support for their claim that it intended to create a mutual rescission, and asserts that this is a legal conclusion, not a fact.  I agree that whether ANPAC intended a mutual rescission is a legal conclusion.

drug possession?" directly on the application.  (Kelley Decl., Exs. C, D, E, F, G, K, M, N, O and P.)[3]  Plaintiffs assert in response that certain of the applications are so unclear that the felony question cannot be discerned.  In reply, ANPAC points out that Plaintiffs have not stated that the felony question is *not* on any of the applications despite submitting a Declaration from Ms. Barrera.  ANPAC also attached more legible copies of the applications to its reply through the Declaration of Ms. Cannon, together with blank "exemplar" applications allegedly containing pages similar to those missing from the Barreras' applications.  Plaintiffs object to the applications and exemplars attached to the reply on the basis that they were not provided during discovery.

ANPAC further asserts that four of the fourteen applications have the felony/drug possession question on the same page as Mrs. Barrera's signature.  (Kelley Decl., Exs. C, D, E and F.)  Plaintiffs admit that two of the applications contain the felony question in minuscule text on the signature pages—together with dozens of other queries, most of which the insurance agent who sold Plaintiffs the policies at issue, Robert Edgin, left blank when he filled out the applications.  Plaintiffs deny that the remaining two applications contain the question because the applications are illegible.

According to ANPAC, the rental owner's application specifically indicates concerning the question regarding felony/drug possession "If yes, do not bind."  This means that if the felony/drug possession question is answered yes, the policy could not

---

[3]  The four electronic applications do not contain the felony question (four of the six 2009 applications).

be bound.  (Kelley Decl., Exs. D, E, F and G.)  Plaintiffs respond that the rental owner's

application, Exhibit D, is illegible.

ANPAC's underwriting guidelines for Rental Owners Policy indicate:

"II.    INELIGIBLE EXPOSURES

    A.    Dwelling
     . . .

      22.    Dwellings owned or occupied by a person(s)
           convicted of a felony or drug possession."

(Kelley Decl., Ex. Q.)

Moreover, the underwriting guidelines for auto policies indicate that applicants

with previous felony convictions may only submit an unbound trial application:

". . .

   9.    Previous Felony Conviction
      Submit unbound on trial application."

(Kelley Decl., Ex. R.)

The application for the Dodge Van also specifically indicates concerning the

question regarding felony/drug possession "If yes, do not bind."  (Kelley Decl., Ex. M.)[4]

The application for the Monte Carlo does not, however, contain the felony/drug

possession question on the hard copy application.  Nonetheless, ANPAC points out that

Ms. Anderson testified that it was her understanding that Mr. Edgin, the insurance

agent, always asked the felony/drug possession questions in connection with any

---

[4] Plaintiffs point out and ANPAC does not dispute that each of the applications provides a space for the applicant to describe the conviction.  Further, ANPAC's underwriting guidelines allow it to make exceptions to insure risks falling outside the guidelines, and allow an agent to submit a Trial Application.

application that was submitted.  (Kelley Decl., Ex. Z, Anderson Depo. 69:13-25, 72:4-10, 133:9-134:20.)  This is contrary to Mr. Edgin's testimony that his habit and practice was to have his staff prepare the preliminary application, including the felony question, using presumptive answers without asking the applicant the underwriting questions.  This is discussed in more detail below.  ANPAC also asserts in reference to the application for the Monte Carlo that the underwriting information includes a question concerning felony convictions and/or drug possession which is submitted with the application to ANPAC.  (*Id.*, Ex. V.)  Plaintiffs deny this, pointing out that ANPAC has not produced any testimony indicating that the underwriting information was, in fact, electronically transmitted to ANPAC by Mr. Edgin or that it did, in fact, receive the underwriting information.

All four (4) of the Electronic Applications have the language:

"This Electronic Transmission Application and Binder requires you, as the applicant, to carefully review and verify the information being sent to ANPAC. It is your responsibility to carefully review and verify that all the information is accurate, truthful, and provides coverage for the correct vehicles and that the coverage you have selected has been provided on the correct vehicle."

(Kelley Decl., Exs. H, I, J and L.)  Plaintiffs admit this, but assert that the applications do not contain any underwriting questions for the applicant to answer or verify.  (*Id.*, Ex. H, ECF No. 76-25 at 32; Ex. I, ECF No. 76-26 at 28; Ex. J, ECF No. 76-27 at 32; Ex. L, ECF No. 76-29 at 43).  Further, they point again to Mr. Edgin's testimony that his habit and practice was to not ask any of the underwriting questions on the applications.

ANPAC asserts that the applications show that each was signed by Lidia Barrera.  (Kelley Decl., Exs. C-P.)  It further asserts that in signing these applications Mrs. Barrera was attesting that all the information included therein was true.  (*Id.*)  Plaintiffs deny these assertions on the basis that ANPAC has not produced any original copies of the insurance applications.

Of the copies that have been produced, Plaintiffs argue that several contain illegible signatures or fragments of signatures that cannot be attributed to Mrs. Barrera. Further, they assert that ANPAC needed to produce admissible evidence demonstrating that Mrs. Barrera signed all the applications; however, ANPAC produced sworn testimony only that Mrs. Barrera signed one of the applications.  It improperly seeks to extrapolate that she signed the others.[5]  In reply, ANPAC asserts that there can be no question regarding the authenticity of the copies, pointing to the applications attached to the reply brief through the Declaration of Michele Cannon.  Further, it contends that it produced the best copies of the applications, and believes the copies are legible as to the critical factual issues, again citing to Ms. Cannon's Declaration and the

---

[5]  Plaintiffs also contend that many of the applications attached to ANPAC's motion are incomplete.  (Mot., Ex. C, ECF No. 76-6 at 20-21; Ex. D, ECF No. 76-17 at 4-6; Ex. E, ECF No. 76-22 at 35-36; Ex. F, ECF No. 76-23 at 30-31; Ex. G, ECF No. 76-24 at 37-39; Ex. K, ECF No. 76-28 at 41-43; Ex. M, ECF No. 76-30 at 33-35.)  ANPAC does not dispute that some of the applications indicate that there was an additional page, but asserts that the final page is not saved or printed out as it does not contain any information ANPAC uses.  Also, Plaintiffs point out that in some applications, the signature page is different in size and appearance from the rest of the application.  (*Id.*, Ex. M, ECF No. 76-30 at 33-35; Ex. N, ECF No. 76-31 at 33-35; Ex. O, ECF No. 76-32 at 36-38; Ex. P, ECF No. 76-33 at 36-40.)  ANPAC asserts that this may be a result of the signature page being faxed.  Also, Plaintiffs note that in some of the applications, electronic storage information indicates that the application's signature page was received and stored by the insurer separately from the rest of the application.  (*Id.*, Ex. C, ECF No. 76-6 at 18-22; Ex. D, ECF No. 76-17 at 3-6.)  Finally, at least two of the applications contain the wrong signature pages, *i.e.,* the signature page for one application is incorrectly attached to another; thus, the signature pages were improperly switched.  (*Id.*, Ex. N, ECF No. 76-31 at 33, 35; Ex. P, ECF No. 76-33 at 36, 40; Ex. O, ECF No. 76-32, 36, 38.)

authenticated copies of all fourteen applications attached thereto.  Finally, ANPAC

asserts that Ms. Barrera's Declaration does not deny in any fashion that she signed

each of the applications or that the signatures thereon are not hers.

ANPAC next asserts that all fourteen applications have the Application and

Binder Agreement language which indicates that ANPAC is relying on information

provided by the applicant:

> "I, the undersigned agree that the statements given to the agent are made
> for the express purpose of inducing the company to issue an insurance
> policy and these statements are true, correct and complete and any policy
> issued as a result of any material misrepresentation shall be declared
> void." (See applications…..)

(Kelley Decl., Exs. C - P.)  Plaintiffs deny this, asserting that only the four short-form

automobile applications contain such language.  In reply, ANPAC admits that the

language on the electronic applications is not identical to the language on the other ten

applications.  However, it remains undisputed that all of the applications indicate that

the statements provided by the Barreras were true and correct.

Mr. Edgin, the insurance agent who sold Plaintiffs the policies, does not have any

specific recollection of the process he went through with the Barreras when they applied

for insurance.  However, he testified that his habit and practice during the 2006 and

2009 period when policies were issued to the Barreras was when someone called about

obtaining insurance, he would first have a member of his staff obtain basic information

about the potential client and the property being insured.[6]  Mr. Edgin's staff would obtain

---

[6] According to Plaintiffs, Mr. Edgin is a captive ANPAC insurance agent, meaning that he only sells insurance products issued by ANPAC.  Mr. Edgin's compensation is directly linked to the number of insurance policies he originates, which first requires that ANPAC accept the applications for insurance he submits.  ANPAC has not disputed this.

the name of the client, his or her address, date of birth, and social security number, as well as details about the property to be insured.  Mr. Edgin also testified that a motor vehicle report and credit report would be run.  (Def.'s Reply to Pls.' Resp., Ex. B, Edgin Depo 58:10-59:11.)  The information would then be provided to do a proposal and obtain a quote.  (*Id.* at 42:6-44:22.)  If the quote was competitive, Mr. Edgin would set up a meeting with the potential client.

At this first meeting, Mr. Edgin's habit and practice was to present the potential client with proposals for insurance.  If the potential client was interested in obtaining the proposed insurance, Mr. Edgin would then set up a second meeting.  Before the second meeting, Mr. Edgin testified that his habit and practice was to have his staff prepare the underwriting questions in the preliminary application, including the felony question, using presumptive answers without asking the applicant those questions.  (Resp., Ex. B, Edgin Depo. 38:13-22; 51:7-52:13; 53:2-20; 135:11-22; 144:24-146:19; 154:25-156:15; 155:11-18; 159:16-163:3; 163:20-165:10; 165:12-166:13; 166:15-167:15; 167:25-170:2; 170:11-173:20; 177:21-180:21; 181:25-187:2; 187:4-191:10).  He testified that the felony box is always checked no during this process.  (*Id.* 146:4-16.)  At no time during this process would Mr. Edgin or his staff ask the underwriting questions to the potential client/applicant.[7]

---

[7]  Thus, Mr. Edgin's habit and practice was to have his staff fill in answers to the underwriting questions, automatically answering "no" to certain questions, including the felony question.  (Resp., Ex. 2, Edgin Depo. 144:10-146:17.)  This gave Mr. Edgin the ability to have the applications speedily prepared so that he could review them with the client.  (*Id.* 146:15-20.)  In Mr. Edgin's words, this process was "the easiest way to not have folks in here for three or four hours."  (*Id.* at 51:10-11.)

Mr. Edgin also testified that once the application is filled out, his habit and practice was to have a second meeting to go through the application with the applicant prior to having them sign it. (Kelley Decl., Ex. S, Edgin Depo. 52:9-53:15, 173:2-16.) The application would normally be reviewed section by section, to see if anything needed to be changed, and then the applicant would sign it. (*Id.*) Many of the applications contained approximately five sections, and each section included many individual questions in small print. (Id., Exs. C, D, E, and F.)   Mr. Edgin clarified that his habit and practice did *not* entail going through the questions and presumptive answers on a question-by-question basis. (*Id.,* Ex. S, Edgin Depo. 149:20-150:4.)[8] Mr. Edgin often reviewed multiple applications during a single meeting.

Plaintiffs assert that at no time during the application process did Mr. Edgin or a member of his staff ask Mrs. Barrera whether any member of her household had been convicted of a felony or drug possession. (Resp., Ex. 1, Barrera Decl. ¶ 2.) ANPAC does not dispute this other than to refer to Ms. Anderson's testimony cited earlier that Mr. Edgin always asked the felony question in connection with any application that was submitted. (Kelley Decl., Ex. Z, Anderson Depo. 69:13-25, 72:4-10, 133:9-134:20.) Further, Plaintiffs state that at no time during the application process did Mr. Edgin or his staff inform Mrs. Barrera that ANPAC did not insure felons.  While ANPAC does not deny this, it asserts that several of the applications advised that ANPAC did not insure felons.

---

[8]  While some applications were faxed rather than reviewed in person with the applicant, it was Mr. Edgin's testimony that the applicant was supposed to read them, sign them, and then send them back. (*Id.* 163:7-18, 173:2-20.)

It is also contended by Plaintiffs that, contrary to Mr. Edgin's testimony concerning his habit and practice, neither he nor his staff reviewed the pre-completed 2006 and 2009 applications with Mrs. Barrera or informed her that she had the opportunity to review them.  (Resp., Ex. 1, Barrera Decl. ¶ 4.)  They also contend that neither Mr. Edgin nor his staff referred Mrs. Barrera to the various sections of the applications or called her attention to the specific questions and answers.  (*Id.* ¶ 5.)  According to Plaintiffs, Mr. Edgin and his staff also did not ask Mrs. Barrera at any time whether the information in the 2006 and 2009 applications was correct or if it needed to be changed.  (*Id.*)  Mr. Edgin merely instructed Mrs. Barrera where to sign.  (*Id.)*  ANPAC disputes these assertions.  It points to Mr. Edgin's testimony as to his habit and practice to go over the applications with the applicants section by section.  Moreover, it asserts that Mrs. Barrera signed the applications and, by signing, indicated the information therein was true and correct.

Mr. Edgin testified that his habit and practice with regard to the 2010 applications of the Barreras differed in one material respect from his process in the preceding years.  Instead of meeting in person, he claims to have faxed the pre-filled applications with a cover sheet asking the applicant to review for any changes and then sign and return the signature pages.  Mr. Edgin admitted that no such cover sheets could be found in his file and that, other than his habit and practice testimony, there was no evidence confirming whether he sent complete applications to Mrs. Barrera or whether he faxed just the signature pages.  Mr. Edgin also acknowledged that he had no independent recollection of faxing the applications.  A note in his file directs someone to "fax

signature pages" with respect to the Barreras' 2010 applications, and only the signature

pages of the 2010 applications produced in this litigation bear any indicia of being faxed.

Mrs. Barrera recalls that for the 2010 applications, Mr. Edgin faxed her just the

signature pages (with "sign here" stickers next to the signature lines), together with

premium withdrawal authorization forms.  (Resp., Ex. 1, Barrera Decl. ¶ 6.)  This is

disputed by Mr. Edgin as being inconsistent with his habit and practice.

Mr. Edgin stated that had he been aware at any time that either of the Barreras

had a felony or drug conviction in their past, he would not have considered them for

insurance.  (Mot., Decl. of Robert Edgin, ¶ 2.)  This was based upon his understanding

that ANPAC simply does not write to felons.  (*Id.*)

Ms. Cannon, the person at ANPAC most knowledgeable regarding underwriting,

testified that despite the fact that the underwriting guidelines for automobile may

indicate a trial application is possible, ANPAC's practice is not to issue policies to a

person convicted of a felony.  (Kelley Decl., Ex. AA, Cannon Depo. 49:23-51:18.)

Ms. Cannon's understanding was echoed by that of ANPAC employees Susan Cave

and Kelli Anderson who both testified that ANPAC did not write insurance policies to

felons in their multiple years of experience.  Ms. Cannon did recall, however, that

ANPAC had insured a felon before.  (Resp., Ex. 3, Cannon Depo. 47:4-8.)

III.   <u>ANALYSIS</u>

A.   <u>Standard of Review</u>

Summary judgment may be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

     B.    <u>The Merits of the Motion</u>

         1.    <u>Rescission</u>

ANPAC asserts that based on the misrepresentations made by Ms. Barrera, the insurance contracts were and are properly subject to rescission.  "Rescission in its most basic form is an equitable remedy designed to return the parties to the status quo prevailing before the existence of an underlying contract."  *Rosenfield v. HSBC Bank,*

*USA*, 681 F.3d 1172, 1183 (10th Cir. 2012).  In order to avoid a life insurance policy on

the basis of misrepresentations in the application, the insurer must prove:

> (1) the applicant made a false statement of fact or concealed a fact in his
> application for insurance; (2) the applicant knowingly made the false
> statement or knowingly concealed the fact; (3) the false statement of fact or
> the concealed fact materially affected either the acceptance of the risk or the
> hazard assumed by the insurer; (4) the insurer was ignorant of the false
> statement of fact or concealment of fact and is not chargeable with
> knowledge of the fact; (5) the insurer relied, to its detriment, on the false
> statement of fact or concealment of fact in issuing the policy.

*Hollinger v. Mut. Ben. Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977).

I first address whether rescission was valid as a matter of law as to the four

applications that do not contain the felony question—the short-form auto applications,

including the one covering the Monte Carlo damaged in the fire.  These applications do

not contain any underwriting questions and do not attach or reference a long-form

application.  Since the applications do not contain any questions, Mrs. Barrera obviously

could not have misrepresented an answer or concealed information related to a

question.  Thus, rescission would not be appropriate under *Hollinger*.  While ANPAC

argues that the underwriting question, including the felony question, was transmitted to

ANPAC separately along with the electronic applications, I find that there are genuine

issues of material fact as to this such that summary judgment is not appropriate as to

the four short-form auto applications that do not contain the felony question.

I now turn to the other ten applications that did contain the felony question upon

which the misrepresentation is based.  Colorado courts have recognized two separate

and distinct fact patterns which present themselves in rescission cases based on a

-16-

misrepresentation in the insurance contract which require distinct approaches with regard to their application to the law.  See *Silver v. Colo. Cas. Ins. Co.*, 219 P.3d 324, 329-30 (Colo. App. 2009).  One example occurs "when the applicant acted in good faith and gave truthful information to the insurer's agent, but the agent inserted false information into the application."  *Id.* at 329.  In that circumstance, under what is referred to as the "*Van Fleet* rule", the insurer is estopped from rescinding the insurance contract.  *Id.*  "The rationale for this rule . . . is that because the applicant gave correct information to the insurer's agent, the insurer is deemed to know that contrary information in the application is false, and, having issued the policy despite knowing of the false information, may not later avoid liability on the policy based on the false statements."  *Id.*  Under the *Van Fleet* rule, the fact that the application may have been signed by the applicant and contained an affirmation attesting to the truth of the matter asserted therein does not change the outcome.  *Id.* at 330; *see also Pacific Mut. Life Ins. Co. v. Van Fleet*, 107 P. 1087, 1089-91 (1910).[9]

On the other hand, the *Silver* court stated that "[a] contrary rule applies . . . if the applicant gave the insurer's agent false information, or did not give the agent any information, and the agent inserted false information into the insurance application."  219 P.3d at 330.  "In such circumstances, the insurer may rescind (or otherwise avoid

---

[9]  As explained in *Silver*, "the *Van Fleet* rule does not ignore the fact the applicant may have signed the application."  *Id.*  "Rather, it regards the agent, and, through agency principles, the insurance company, as more culpable than the applicant where the applicant gave correct information to the agent, for the reason that the company issued the policy notwithstanding that it is deemed to have known of the false information."  *Id.*  "Both parties may be at fault, but the *Van Fleet* rule expresses a policy judgment that the risk of loss should fall on the insurance company in such circumstances."  *Id.*

liability on) the insurance contract based on any material misrepresentations contained therein." *Id.* This rule, referred to by *Silver* as the *Wich* rule, "is based on the rationale that in such circumstances the applicant is not entitled to assume that the agent included correct information in the application, and in contrast to the situation in the cases applying the *Van Fleet* rule, the applicant's culpability outweighs that of the agent." *Id.*

The question is which rule applies in the case at hand, or whether these cases are even applicable.  I find that this will turn on the evidence, and that there are genuine issues of material fact that impact this.  First, I find no evidence in connection with the summary judgment motion that Mrs. Barrera gave truthful information to Mr. Edgin, ANPAC's agent, but Mr. Edgin inserted false information into the application.  Thus, the *Van Fleet* rule, by its terms, does not apply.  Thus, I turn to the *Wich* rule.

Second, I find no admissible evidence for purposes of summary judgment that supports a finding that Ms. Barrera actually gave Mr. Edgin false information.  Instead, Mr. Edgin testified that his habit and practice was to presumptively answer the underwriting questions without input from the applicant.[10]

-----

[10] I note as discussed in Section II, *supra*, that there is deposition testimony by        Ms. Anderson, the claims professional assigned to the file, that it was her understanding that Mr. Edgin always asked the felony/drug possession questions in connection with any application that was submitted.  (Kelley Decl., Ex. Z, Anderson Depo. 69:13-25, 72:4-10, 133:9-134:20.)  However, I find that this is inadmissible hearsay.  *See Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) ("Speculation, opinion, or hearsay testimony is "not suitable grist for the summary judgment mill.").  Moreover, even if it were admissible, I find that Ms. Anderson's understanding about what Mr. Edgin did cannot be used to contradict Mr. Edgin's own statements about his habits and practice.

To the extent there is evidence that could support a finding that Mrs. Barrera had the opportunity to review the completed applications, including the felony question, and did not correct it, I find that the evidence is disputed on this issue and summary judgment is not proper. The evidence could also support a finding that Ms. Barrera did not give Mr. Edgin any information, and that Mr. Edgin inserted false information into the application. At the least, there are genuine issues of material fact as to these facts. Under this scenario, ANPAC argues that the *Wich* rule applies, relying on the *Silver* case.

I acknowledge that *Silver* could be read to support application of the *Wich* rule in this case. While *Silver* applied the *Van Fleet* rule because the applicant provided truthful answers concerning the underwriting questions but the agent input false answers, it indicated the contrary rule that rescission would be appropriate based on falsities in the application where an applicant gave the agent false information "or *did not give the agent any information*", and the agent inserted false information into the application. *Silver*, 219 P.3d at 330 (emphasis added). However, given the facts of the *Silver* case, its ruling appears to apply in situations where an applicant is actually *asked* underwriting questions by the agent and gives a false answer or no answer at all.[11] The court was not presented with the circumstance here where an agent filled out the

---

[11] Indeed, two of the three cases relied on by *Silver* in support of the *Wich* rule also involved circumstances where the insured was actually asked for information about the application. *Koin v. Mut. Benefit Health & Accident Ass'n,* 41 P.2d 306, 307–08 (Colo. 1935); *Modern Woodmen of America v. Int'l Trust Co.,* 136 P. 806, 810-11 (Colo. App. 1913). The third case, *Sun Fire Office v. Wich*, 39 P. 587 (Colo. App. 1894), is discussed below.

application without asking any of the underwriting questions to the insured. Thus, I find that *Silver* does not control or mandate that the *Wich* rule applies.

The final case relied on by *Silver*, the actual *Wich* decision, at first blush appears to apply to this case. *Sun Fire Office v. Wich*, 39 P. 587 (Colo. App. 1894). In *Wich*, as here, an insurance solicitor filled in the application with false information without input from the applicant. *Id.* at 587, 590. The applicant signed the application, immediately above which was an affirmation of the truth of the acts and circumstances. *Id.* at 590. *Wich* found that the applicant was bound by the representations contained therein, and "should suffer the consequences of his own negligence." *Id.*

However, I find the continued viability of *Wich* questionable given the changes in the law since the case was decided. While *Wich* recognized that courts in other jurisdictions held the insurer responsible for the acts of its soliciting agents when the solicitor completed the application without participation from the insured, it noted that under Colorado law at that time, the solicitor was not an agent of either the insured or the insurance company. *Wich*, 39 P. at 589. The law protected an insurance company from the solicitor's fraudulent acts and the insured had no protection. *Id. Wich* then stated that "[t]he whole system of representation by solicitors is vicious, and should be abrogated by legislation or otherwise, and the principals made responsible for the acts of the agents within the seeming and apparent limits of their authority." *Id.* However, it found that until the Colorado legislature addressed whether soliciting agents represented the insured or the insurer, it had to hold each party responsible for its own acts. *Id.*

Shortly after the *Wich* case was decided, legislation was passed which holds that insurance solicitors represent the insurer, not the insured.  *See* Colo. Rev. Stat. § 10-2-401.[12]  Given this, it is questionable at best whether *Wich* would have been decided the same way today.  Under these circumstances, I find it is not controlling.

Indeed, it appears that the precise factual scenario has not been addressed by the Colorado courts since the passage of the legislation holding that an soliciting insurance agent represents the insurance company.  Nonetheless, I find the case of *New York Life Ins. Co. v. Fukushima*, 220 P. 994 (Colo. 1923), *disapproved on other grounds*, *Hollinger*, 560 P.2d at 826-27, persuasive on the issue, and believe that the Colorado Supreme Court would likely adopt its ruling in connection with the facts in dispute in this case.

In *Fukushima*, an applicant for insurance who did not read or write English was questioned through an interpreter employed by the insurer's agent, and his answers were written by the insurer's medical examiner on the application.  220 P. at 995.  Thus, the medical examiner, an agent of the insurer, completed the application, and there was evidence that some answers were made without the questions being asked of the

---

[12]  The statute says, "Every insurance producer who solicits or negotiates an application for insurance of any kind on behalf of an insurer shall be regarded as representing the insurer and not the insured or any beneficiary of the insured in any controversy between the insurer and such insured or beneficiary."  *Id.*, § 10-2-401(1).  An "insurance producer" is a person who, like Mr. Edgin, solicits, negotiates, effects, procures, delivers, renews, continues, or binds policies of insurance for risks in Colorado.  Colo. Rev. Stat. § 10-2-103(6)(a).   Section 10-2-401 finds its roots in the early 1900's, when the Colorado legislature enacted a law protecting insureds by deeming soliciting insurance agents to be agents of the insurer.  § 2491(9), C. L. 1921; *see also Universal Ins. Co. v. Arrigo*, 96 Colo. 531, 534, 44 P.2d 1020, 1021 (1935).

insured and/or that the interpreter may not have heard a particular question asked. *Id.*

at 996. The Colorado Supreme Court held:

> The inevitable conclusion is that the fact was, and the court so found, that
> the examiner took it upon himself to answer this question without
> propounding it to the insured. If so, the company would of course be
> bound thereby. Especially is this true when, as here, the insured could
> have had no knowledge of the contents of the document he was signing
> save what he obtained from the agents of the company.

*Id.*

Here, as in *Fukushima*, there is evidence that supports an inference that the

insurance agent, Mr. Edgin, or his staff filled in underwriting questions in the application,

including the question about whether anyone in the household has committed a felony,

without any input from Ms. Barrera and without questioning her about this. Indeed,

Plaintiffs presented evidence that at no time during the application process did

Mr. Edgin or his staff ask Mrs. Barrera whether any member of her household had been

convicted of a felony or drug possession. Further, they presented evidence that at no

time during the application process did Mr. Edgin or his staff inform Mrs. Barrera that

ANPAC did not insure felons.

Also as in *Fukushima,* there is evidence which could support a finding that

Mrs. Barrera, the applicant, had no knowledge of the contents of the applications she

was signing. Thus, I find that there are genuine issues of material fact as to whether,

even assuming that Ms. Barrera signed the applications, she was provided an

opportunity to review the questions and answers before signing them.[13]  Plaintiffs present evidence that, contrary to Mr. Edgin's testimony concerning his habit and practice, neither he nor any member of his staff reviewed the pre-filled 2006 and 2009 applications with Mrs. Barrera or informed her that she had the opportunity to review them.  Plaintiffs also present evidence that neither Mr. Edgin nor a member of his staff: (1) referred Mrs. Barrera to the various sections of the applications or called her attention to the specific questions and answers; or (2) asked her at any time whether the information in the 2006 and 2009 applications was correct or if it needed to be changed.  As to the 2010 applications, Plaintiffs presented evidence that Mr. Edgin faxed Mrs. Barrera only the signature pages (with "sign here" stickers next to the signature lines), together with premium withdrawal authorization forms.

In so finding, I reject ANPAC's argument that Plaintiffs are attempting to create sham issues of fact on this issue.  ANPAC asserts in that regard that the Declaration submitted by Mrs. Barrera is directly contrary to her testimony under oath wherein she indicated that the only reason she did not tell ANPAC about her husband's felony was that she must not have read the application, not that she was somehow denied an opportunity to do so.  "To determine whether an affidavit creates a sham fact issue,

---

[13]  I note that ANPAC has produced sworn testimony only that Mrs. Barrera signed one of the applications.  She was not asked in her deposition about whether she signed the other applications.  As noted in Section II, *supra*, Plaintiffs dispute Ms. Barrera's signatures based on illegibility of certain of the applications and also question the authenticity of the applications/ policies on a number of grounds.  I find that I need not address the issues of illegibility and/or authenticity at this time because, even if I assume that the applications are executed and authentic, I find that summary judgment must be denied.  I do believe, however, that there are genuine issues of material fact as to at least some of the applications.  Also, to the extent that Plaintiffs object to the exemplars and more legible copies of the applications attached to the reply on the basis that they were not produced during discovery, these objections should be dealt with at trial.

courts consider whether: (1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Sumpter v. Ahlbrecht*, No. 10-cv-00580-WYD-MJW, 2012 WL 252980, *5 (D. Colo. Jan. 26, 2012) (quotations omitted). "For an affidavit to be disregarded under this rule, there must be a contradiction or inconsistency between the affidavit and the prior sworn statements." *Id.*

In the case at hand, Mrs. Barrera's affidavit is not necessarily contradicted by nor inconsistent with her examination under oath. In the first paragraph of Mrs. Barrera's affidavit she states that Mr. Edgin or his staff filled out all of the applications at issue without asking her the underwriting questions. This appears to be consistent with her examination under oath where she twice said that Mr. Edgin filled out the application for the burned residence. (Pls.' Surreply, Ex. 13, Barrera Depo. 84:7-10.)[14] In the second paragraph of her affidavit, Mrs. Barrera states that at no time during the application process did Mr. Edgin or his staff ask her the felony question. This again appears to be consistent with her examination under oath where she indicated that Mr. Edgin did not ask the question. (*Id.* 102:10-15; 102:25-103:1.) The remaining four paragraphs in Mrs. Barrera's affidavit concern details of the application process to which ANPAC chose not to inquire. Plaintiffs also assert that ANPAC interrupted Mrs. Barrera when

---

[14] ANPAC addressed only the application for the burned residence during the examination under oath. Accordingly, it did not question Mrs. Barrera about the remaining thirteen applications at issue in this matter.

she tried to provide additional details regarding the application process.  (*Id.* 86:14-15.)[15]

Based on the foregoing, I find under *Fukushima* that summary judgment must be denied on the basis that the rescission of the policies was valid.  Construing the facts in the light most favorable to the Plaintiffs, ANPAC may be bound by the negligent or fraudulent acts of its agent Mr. Edgin and estopped from rescinding the policies based on any misrepresentations in the applications.[16]

In further support of this finding, I note that the Colorado Supreme Court has limited rescission based on misrepresentations procured through the malfeasance of their own agents in a number of other cases.  *See, e.g., Fed. Life Ins. Co. v. Kras,* 45 P.2d 636, 637-38 (Colo. 1935) ("The solicitor of an insurance company is its agent; his acts and knowledge are those of his principal, and the insured cannot be held responsible for a wrong perpetrated through his fraud or negligence."); *State Ins. Co. of Des Moines v. Taylor*, 24 P. 333, 336 (Colo. 1890) ("[A]ny misstatements, errors, or omissions, the results of the agent's] own fraud, carelessness, or neglect, are to be deemed those of the insurer, and not those of the insured.").  While the Colorado Supreme Court did hold an insured responsible for an application originally filled out by

---

[15]  The three *Sumpter* factors also weigh in favor of allowing Mrs. Barrera's affidavit.  Namely, Mrs. Barrera was not represented by counsel during her examination under oath and was not exposed to cross-examination.  She did not have access to all of the evidence because the examination took place before ANPAC's rescission of the policies.  Finally, the affidavit can be seen as Mrs. Barrera's attempt to explain the matters ANPAC failed to address at the examination and to which it interrupted her answers.

[16]  I note that Magistrate Judge Hegarty also addressed an argument regarding Fukushima's applicability in a Recommendation on Plaintiffs' Motion to Amend the Complaint to Add a Claim for Exemplary Damages.  He found *Fukushima* distinguishable because Plaintiffs did not assert that they were denied an opportunity to review the applications.  Plaintiffs have now, however, presented such evidence in response to the summary judgment motion.

an agent in *Koin v. Mutual Ben. Health & Acc. Ass'n*, 41 P.2d 306, 308 (1935), its

holding was based on the fact that the two parties colluded to defraud the insurer.[17]

These cases are consistent with the purpose of statutes like Colo. Rev. Stat. § 10-2-401

which are designed to hold insurers responsible for the fraud or negligence of its

agents, and to protect applicants like Mrs. Barrera by allowing them to rely on the fact

that the agent is seeking all the information the insurer needs.  *See Bailey v. Lincoln*

*Gen. Ins. Co.*, 255 P.3d 1039, 1053 (Colo. 2011) ("Colorado courts have honored the

reasonable expectations of an insured where circumstances attributable to an insurer

have deceived ordinary, objectively reasonable insureds into believing that they are

entitled to coverage, while the insurer would maintain they do not enjoy such

coverage."); 3 Couch on Ins. § 47:30 (3d ed. 1999); 43 Am. Jur. 2d Ins. § 125 (2012).

I also note in support of my finding that the overwhelming majority of courts to

have considered the issue have held that an insurance company is estopped to rescind

a policy where its agent fills out the application without asking the underwriting

questions—even if the insured subsequently signs the application.  *See, e.g., Guy v.*

---

[17] While *Silver* relied on *Koin* in support of its statement of the *Wich* rule, I find that the *Koin* case actually supports my finding that under Plaintiffs' version of the facts ANPAC would be estopped from rescinding the policies.  In *Koin*, the agent completed the application during a time when the plaintiff was so busy "that he gave only slight attention to the questions and answers, all answers being written by the agent; that the agent of his own motion, without asking the questions material to this inquiry, wrote answers that were untrue. . . ." 41 P.2d at 307.  Relevant to this case, *Koin* stated that "[i]f this were the entire story, the case might be said to come within the doctrine announced by Colorado decisions, the cases resting on varying facts, to the general effect that an insurance company may not be heard to say it was not apprised of what its agent knew) (citing *Fukushima* and *Van Fleet*).  The *Van Fleet/Fukushima* rule was not applied by *Koin* only because "[a]fter the soliciting agent had made his own answers to the controlling questions, clearly false", the agent signed the application for the plaintiff at plaintiff's request but did not indicate that plaintiff did not sign the application." *Id.* at 308.  The court found that based on the plaintiff's and agent's collusion, "the insurance company was without representation." *Id.*  Here, there was obviously no such collusion.

*Commonwealth Life Ins. Co.*, 894 F.2d 1407, 1410 (5th Cir. 1990) (insurer could not

rescind where agent asked the applicant only her address, social security number, and

date of birth and filled out the remainder of the application without asking another

question); *Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 788 (Kan. 2010) (holding that

the insurer was estopped where the agent filled in the application without asking the

questions to the insured); *Neill v. Nationwide Mut. Fire Ins. Co.*, 139 S.W.3d 484, 489

(Ark. 2003) (stating that the insurer was estopped if the agent misstated the applicant's

response or failed to asked any questions on the application).[18]   Insurance treatises

similarly provide that an insurance company cannot rescind a policy where its agent

filled out the application without first asking the questions of the applicant.   46 C.J.S.

Ins. § 1207 (2012) ("Where the insurance company prepares the policy and the

application form, and the insured is asked to do nothing more than sign it, the company

cannot avoid liability on the ground that the information contained in the application is

not correct.") (footnotes omitted); *see also* 4 Couch on Ins. §§ 51:1, 51:3, 51:7 (3d. ed.

1999).

---

[18]   *See also Acuity Mut. Ins. Co. v. Frye*, 699 F. Supp. 2d 975, 986 (E.D. Tenn. 2010) (applying statute similar to Colo. Rev. Stat. § 10-2-401 and holding that insurer was responsible for errors in application input by its agent); *Emmco Ins. Co. v. Palatine Ins. Co.*  58 N.W.2d 525, 562 (Wis.1953) ("The authorities almost unanimously hold that where an agent of an insurance company writes a statement of fact into an application for a policy without making inquiry of the insured . . . the company is precluded on the theory of either waiver or estoppel from showing the falsity of such statement in order to void liability on the policy."); *Pekin Ins. Co. v. Adams*, 796 N.E.2d 175, 181 (Ill. App. Ct. 2003) ("[I]f an insurance agent fills out an application for an applicant, and without any collusion between the agent and applicant, inserts a false answer into the application, a provision that the applicant has read the application and verified the answers before signing it will not save the insurer . . . ."); *Beck v. Capitol Life Ins. Co.*, 363 N.E.2d 170, 173 (Ill. Ct. App. 1973) (holding that allowing an insurer to rescind based on its own agent's "unskillfulness" would be unjust and against public policy); *Provident Life & Accident Ins. Co. v. Parks*, 38 S.W.2d 446, 447 (Ky. Ct. App. 1931) (insurer could not rescind where application was prepared by insurer's agent and signed by applicant).

Based on the foregoing, I find that the jury must decide whether Mrs. Barrera made any of the misrepresentations in the applications, and whether she did so knowingly.  Since I find that summary judgment is improper as a whole on the rescission claim, I need not address ANPAC's argument regarding the individual applications related to the remaining ten applications at issue.[19]  I also deny ANPAC's motion to the extent it asserted that the valid rescission of the policies entitled it to judgment on Plaintiff's claims under the Quick Pay statutes or for bad faith.

### 2.    Damages Relevant to the Breach of Contract Claim

I now turn to ANPAC's argument that the breach of contract claim fails as to the eleven policies not implicated in the loss, because the Barreras have not alleged damages with respect to those eleven policies.  Plaintiffs disagree, arguing that the rescission of each and every one of the fourteen insurance policies amounted to a breach of contract giving rise to a claim for damages.

I deny ANPAC's summary judgment motion as to this argument.  Colorado law instructs that any such breach gives rise to a claim for damages, and further, that the non-breaching party is at the very least entitled to nominal damages.  *See, e.g., Gen. Ins. Co. of Am. v. City of Colorado Springs*, 638 P.2d 752, 759 (Colo. 1981).  Thus, the Barreras have a vested interest in seeing the policies reinstated and are entitled to at least nominal damages if they succeed.

---

[19]  I reject, however, ANPAC's argument that under *Barciak v. United of Omaha Life Ins. Co.*, 777 F. Supp. 839, 843 (D. Colo. 1991), an insurer is entitled to rescind a policy based on misrepresentations in another.  *Barciak* does not support that argument, as it did not address rescission in such a context.

3.      The Bad Faith Claim

Finally, ANPAC asserts that it is entitled to summary judgment as to Plaintiffs'

bad faith claims because its conduct was not willful, wanton, reckless or outrageous as

a matter of law.  ANPAC asserts in that regard that it only chose to rescind the policies

after a thorough investigation and advice of counsel based on interpretation of the law,

including *Silver*.  At the time ANPAC rescinded these policies it was its understanding

that the Barreras were asked the felony/drug possession question on each and every

occasion that the applications were filled out and that the Barreras misrepresented the

facts.  ANPAC also argues that Plaintiffs' additional allegations of bad faith simply do

not withstand scrutiny.  Any allegations that relate to policies which would not have

provided coverage are irrelevant., as there cannot be bad faith without the failure to pay

a claim, *i.e.*, a claim was not presented under these policies and denied by ANPAC.

Turning to my analysis, it is axiomatic that an insurer must deal in good faith with

its insured.  *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo.2004).  "'Due to

the special nature of the insurance contract and the relationship which exists between

the insurer and the insured, an insurer's breach of the duty of good faith and fair dealing

gives rise to a separate cause of action arising in tort.'"  *Zolman v. Pinnacol Assur.*, 261

P.3d 490, 496 (Colo. App. 2011) (quotation and internal quotation marks omitted).  In

the first party context, involving "a bad faith claim against the insurer for its alleged

misconduct with its own insured", as here, "the insured must prove that (1) the insurer's

conduct was unreasonable under the circumstances, and (2) the insurer either

knowingly or recklessly disregarded the validity of the insured's claim."  *Id.*

"[T]he reasonableness of an insurer's conduct is measured objectively based on industry standards." *Zolman*, 261 P.2d at 496. "Under Colorado law, it is reasonable for an insurer to challenge claims that are 'fairly debatable.'" *Id.* (quotation omitted). "Thus, an insurer will be found to have acted in bad faith only if it has intentionally denied, failed to process, or failed to pay a claim without a reasonable basis." *Id.* "Indeed, even if an insurer possesses a mistaken belief that a claim is not compensable, it may be within the scope of permissible challenge." *Id.* "What constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury." *Id.* "However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Id.*

I find that there are genuine issues of material fact as to ANPAC's conduct regarding rescission of the insurance policies such that summary judgment must also be denied on the bad faith claim. Construing the evidence in the light most favorable to Plaintiffs, the evidence could support a finding that ANPAC issued policies to the Barreras with no investigation, took $25,000 in premiums over a five-year period, and then abandoned the Barreras in the face of a catastrophic loss. It rescinded the policies without even contacting Mr. Edgin to learn how he took the applications, and despite the fact that four of the applications indisputably did not ask the felony question. Moreover, it rescinded the policies even though at least some of the applications were illegible or incomplete. Moreover, ANPAC failed to notify the Barreras that cashing the premium refund checks may effect a mutual rescission, and then it sent letters urging the Barreras to cash the checks. Plaintiffs' bad faith expert has opined

that ANPAC's conduct was in bad faith, and a reasonable jury could reach the same conclusion.

While I agree with ANPAC that rescission may have been fairly debatable based on the *Silver* case, this is not dispositive of the issue of bad faith. *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1218 (Colo. App. 2010) ("fair debatability is not a threshold inquiry that is outcome determinative as a matter of law, nor is it both the beginning and the end of the analysis in a bad faith case"). *Sanderson* agreed "with the Arizona Supreme Court's statement that '[w]hile it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable. But in defending a fairly debatable claim, an insurer must exercise reasonable care and good faith.'" *Id.* at 1217-18 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.,* 196 Ariz. 234, 995 P.2d 276, 279 (2000)).  Thus, when a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was fairly debatable, this simply "weighs against a finding that the insurer acted unreasonably." *Vaccaro v. American Fam. Ins. Co.*, 275 P.3d 750, 759 (Colo. App. 2012).  It does not warrant judgment as a matter of law.

Finally, ANPAC argues that the bad faith claim fails as a matter of law as to eleven of the fourteen policies at issue that do not implicate the claims for loss.  It asserts that  without any claims for ANPAC to fail to pay, there simply can be no bad faith.  I reject this argument as well.  The Colorado Supreme Court has made clear that an insurance bad faith claim may exist outside the scope of the insurance claim setting. *Ballow v. PHICO Ins. Co.,* 875 P.2d 1354, 1363 (Colo. 1993).  *Ballow* held that the duty

of good faith and fair dealing owed by an insurance company was "a broad and wide ranging one, extending to 'everything pertaining' to the provision of insurance services to the public." *Id.*  This was because the relationship created by the insurance contract "'permeates *all* of the dealings of the parties'"; thus, "all persons providing insurance services to the public must 'be at all times actuated by good faith in everything pertaining thereto.'" *Id.* (quotations omitted).

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 76) is

**DENIED**.

Dated:  September 27, 2013

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge